UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| GUIDANT SALES CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER A. BAER,<br><br>Defendant. | Case No. 09-CV-0358 (PJS/FLN)<br><br>ORDER GRANTING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER |

Robert L. Schnell, Jr., Martin S. Chester, and Christina Rieck Loukas, FAEGRE & BENSON LLP, for plaintiff.

George R. Wood, LITTLER MENDELSON, P.C., for defendant.

Defendant Christopher Baer is a former regional sales manager for plaintiff Guidant Sales Corporation ("Guidant"). Baer left his employment with Guidant in December 2008 to work as a sales representative for Biotronik, Inc. ("Biotronik"), a competitor of Guidant. Guidant brings this breach-of-contract action against Baer alleging that Baer is violating a noncompete agreement. This matter is before the Court on Guidant's motion for a temporary restraining order enforcing the terms of the noncompete agreement. The Court heard argument on Guidant's motion on February 24, 2009. For the reasons stated below, the Court grants the motion in part.

I.  BACKGROUND

Guidant is a wholly-owned subsidiary of Boston Scientific Corporation, a manufacturer of cardiac rhythm management ("CRM") devices such as pacemakers, implantable cardioverter defibrillators, and cardiac resynchronization therapy defibrillators. Baer started working for

Guidant in 2002 as a sales representative selling CRM devices in the Philadelphia area.  Baer was originally an at-will employee, but in 2005 Baer entered into a written Employment Agreement with Guidant under which Baer received a base salary and certain guaranteed payments and could be terminated only for cause.[1]  *See* Baer Decl. Ex. 2 §§ 2, 3, 9.  As part of the consideration for the Employment Agreement, Baer signed a separate noncompete and confidentiality agreement.  *Id.* at 1.  The Employment Agreement was to last through 2009, at which time Baer's employment would revert to at-will.  *Id.* § 10.

In December 2006, Guidant promoted Baer to the position of regional sales manager.  To that end, Guidant and Baer executed an Addendum to the Employment Agreement that modified the Employment Agreement in several respects.  *See* Baer Decl. Ex. 1.  For example, under the Addendum, Baer's term-of-years employment ended in December 2008, rather than December 2009.  *Id.* § 1.  Moreover, Baer's base salary and guaranteed payments were altered somewhat.  One important change was that Baer was permitted to participate in the regional manager compensation plan.  *Id.* §§ 2, 3.  Baer's new position was based in Pittsburgh rather than in Philadelphia.

In conjunction with his promotion, Baer also signed a new noncompete and confidentiality agreement.  *See* Compl. Ex. A.  It is this agreement that Guidant alleges Baer is now breaching.  The noncompete agreement prohibits Baer from selling or supporting the sale of

---

[1]Baer's compensation structure at Guidant was fairly complex and is not easily summarized.  The Court will discuss further details of Baer's compensation as necessary in its analysis of Guidant's motion.

competing products to any "GSC Account" for a period of 365 days following the termination of Baer's employment with Guidant.[2] *Id.* § 3. A "GSC Account" is defined as follows:

> "GSC Account" means those physicians, hospitals, clinics, and other persons and entities to whom or for whom, [Baer] or persons under [Baer]'s supervision sold, solicited the sale of, supported or supervised the sale of, or supported or supervised the implantation or other use of any [Guidant] Product during the twelve (12) months immediately preceding the termination of [Baer]'s GSC employment. "GSC Account" includes not only the persons and entities themselves, but also those employees, agents, or other affiliated persons involved in the purchase, implantation, or use of any [Guidant] Product.

*Id.* § 2(e).

Baer resigned his job at Guidant on December 19, 2008 to become an independent distributor of CRM products for Biotronik. Sheehan Decl. ¶ 28. As discussed in more detail below, during the twelve-month period preceding his resignation Baer had numerous contacts with doctors in Philadelphia. Since leaving Guidant, Baer has contacted some of those same doctors on behalf of Biotronik. Guidant now moves for a temporary restraining order prohibiting Baer from selling Biotronik products to those doctors or any other "GSC Accounts."

---

[2] Specifically, the noncompete agreement states that Baer "shall not sell, solicit the sale of, support the sale of, support or supervise the sale or implantation or other use of, or otherwise have any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect of any Competitive Product with respect to any GSC Account." Compl. Ex. A § 3. This prohibition applies "regardless of whether [Baer] acts directly or indirectly or . . . personally or as an employee, agent or otherwise for another." *Id.*

## II.  ANALYSIS

### *A.  Standard of Review*

A court must consider four factors in deciding whether to grant a TRO or a preliminary injunction:  (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on the other litigants; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  TROs and preliminary injunctions are extraordinary remedies, and the party seeking such relief bears the burden of establishing the *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

### *B.  Likelihood of Success*

The parties do not dispute that, pursuant to their various written agreements, Minnesota law governs this breach-of-contract action.  Under Minnesota law, noncompete agreements are disfavored and will be upheld only if they are reasonable in scope.  *Freeman v. Duluth Clinic, Ltd.*, 334 N.W.2d 626, 630 (Minn. 1983); *Overholt Crop Ins. Serv. Co. v. Bredeson*, 437 N.W.2d 698, 703 (Minn. Ct. App. 1989).  In addition, if the noncompete agreement is not ancillary to the initial employment contract, it must be supported by independent consideration.  *Freeman*, 334 N.W.2d at 630.

Baer concedes that the noncompete agreement is reasonable in scope, but argues that it is invalid for lack of independent consideration.  The Court disagrees.  In determining whether a noncompete agreement is supported by independent consideration, courts examine whether the employee gained anything in exchange for signing the agreement.  *See Freeman*, 334 N.W.2d at 630; *Nat'l Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 740-41 (Minn. 1982); *Davies & Davies*

*Agency, Inc. v. Davies*, 298 N.W.2d 127, 130-31 (Minn. 1980); *Sanborn Mfg. Co. v. Currie*, 500 N.W.2d 161, 164 (Minn. Ct. App. 1993). Here, it is clear that Baer received something substantial in exchange for signing the agreement — a promotion to a management position. This promotion gave Baer increased authority and responsibility. Baer Decl. ¶ 6 (as a regional sales manager, Baer managed and supervised Guidant's CRM sales employees in Pittsburgh); Sheehan Decl. ¶ 10 (regional sales managers develop and coordinate overall sales strategies for their region and must understand the characteristics and needs of all the customers in their region). *Cf. Davies*, 298 N.W.2d at 131 (finding independent consideration where the employee continued his employment for ten years after signing the agreement and advanced to a position that would not have been open to him if he had not signed the contract); *Sanborn Mfg. Co.*, 500 N.W.2d at 164 (finding no independent consideration because there was no difference between what the employee was promised in his initial employment contract and what he received in the course of his employment). Just as in *Davies*, and unlike in *Sanborn*, the managerial position would not have been open to Baer if he had refused to sign the noncompete agreement. Baer's promotion is thus sufficient consideration for the noncompete agreement.

Baer disagrees, arguing that he actually lost income as a result of his promotion.[3] But in deciding whether a noncompete agreement is supported by independent consideration, a court must consider the entire context, and not just the money. Every day, workers accept positions that pay them less but that offer more challenging or satisfying work, or a better chance of future

---

[3]Baer also points out that his term of employment — that is, the time in which he could be fired only for "cause" — was shortened by one year when he was promoted. In response, Guidant argues that Baer's commitment to work for Guidant was also shortened by one year, allowing Baer to become a "free agent" and seek alternative employment sooner. Baer then took advantage of his freedom by accepting a generous offer from Biotronik.

advancement, or shorter or more predictable hours, or less travel, or less stress, or a host of other nonmonetary benefits that more than make up for the reduction in salary.  Baer ignores the overall context in which he signed the noncompete agreement.  It is highly unlikely that Baer would have accepted promotion to a management position unless *something* about the position made it more satisfying than continuing on as a sales representative.  That "something" provided the independent consideration for the noncompete agreement.

Moreover, even if this Court were to focus only on money, Guidant is likely to succeed in proving that Baer's compensation structure was more favorable to him under the Addendum than it was under the original Employment Agreement.  As noted earlier, Baer's compensation structure was quite complex, and it is not possible to determine Baer's exact compensation on the current record.  But it does not appear to be true that Baer's compensation decreased upon his promotion — at least not initially.  According to the original Employment Agreement, Baer was guaranteed income of at least $437,376 in 2007.  *See* Baer Decl. Ex. 2 §§ 2, 3.[4]  But after signing the Addendum, Baer was entitled to at least $448,608 in 2007.  Baer Decl. Ex. 1 §§ 2, 3.  And Guidant asserts, without contradiction, that Baer was actually paid $459,000 in 2007.  Sheehan Decl. ¶ 12.  It thus appears that, in 2007, Baer received *more* under the Addendum than he would have received under the original Employment Agreement.[5]

---

[4]The Court arrives at this and related figures by calculating the amount of Baer's base salary and guaranteed payments under the relevant contracts.

[5]The Court cannot be sure because, under the original Employment Agreement, Baer was also entitled to the difference between his actual earned commissions and the payments guaranteed under the Employment Agreement (assuming that his actual earned commissions were greater than the guaranteed payments).  Baer Decl. Ex. 2 § 3(b).

True, Baer's compensation apparently decreased in 2008, to $395,000.[6]  Sheehan Decl. ¶ 12.  But it would be a mistake to rely exclusively on the actual amount that Baer was paid to assess whether he received a less favorable compensation package.  Suppose, for example, that a sales representative is given a choice:  He can remain as a sales representative and be guaranteed a salary of $400,000 for 2010, without any opportunity to earn more.  Or he can accept a promotion to management, be guaranteed only $200,000 for 2010, but have the chance to earn up to $800,000, depending on the performance of the company.  If the employee accepts the promotion, it may be because he finds that a compensation package that gives him a chance to earn bigger dollars is more attractive than a compensation package that guarantees him smaller dollars.  The fact that his gamble does not pay off — the fact that he earns, say, only $300,000 in 2010 — does not mean that the compensation package that he received when he was promoted was less favorable than the compensation package that he would have received by remaining a sales representative.

Baer's compensation was largely dependent on sales performance and, as a manager, Baer was eligible for additional types of compensation, such as bonuses that were tied to regional sales goals.  Second Sheehan Decl. ¶ 4; Baer Decl. ¶¶ 15-16.  It thus appears likely that, whatever *actual* compensation Baer received, he was *eligible* to receive more as a manager than he was eligible to receive as a sales representative.  Even if money were the only relevant

---

[6] On the current record, it is not possible to say whether Baer received less in 2008 than he would otherwise have been entitled to under the original Employment Agreement.  Under the original Employment Agreement, Baer's guaranteed compensation for 2008 and 2009 was based on the average commissions Baer earned in 2006 and 2007, Baer Decl. Ex. 2 § 3(a), which information is not before the Court.

consideration — and, as explained above, it is not — Guidant is likely to succeed in proving that the noncompete agreement is supported by independent consideration.

Baer next contends that Guidant is unlikely to succeed in proving that he is violating the noncompete agreement. The parties' dispute on this issue largely comes down to whether the contacts that Baer had with doctors in Philadelphia during 2008 render those doctors "GSC Accounts" under the noncompete agreement.[7] Guidant argues that Baer's 2008 contacts with the Philadelphia doctors "supported . . . the sale of" Guidant's products within the meaning of the noncompete agreement and thus that the doctors with whom Baer had contact are "GSC Accounts." *See* Compl. Ex. A § 2(e).

Baer first argues that, because noncompete agreements are disfavored under the law, the Court should narrowly construe the word "support" to find that Baer's activities were not in support of sales to the Philadelphia doctors. But, as noted, Baer is not contesting the substantive reasonableness of the restrictions imposed under the noncompete agreement. Baer's decision is wise. Courts have consistently found one-year restrictions that are limited to a former employee's sales area to be reasonable. *See Guidant Sales Corp. v. Niebur*, No. 01-1772, 2001 WL 1636502, at *7 (D. Minn. Oct. 18, 2001). The noncompete agreement in this case is even more narrowly drawn. Rather than using a geographical limitation, the agreement applies only to customers with whom Baer had sales-related contacts in the year preceding the termination of

---

[7]Guidant also alleges that Baer has had impermissible contact with GSC Accounts in Pittsburgh since his resignation. As discussed at the hearing on Guidant's motion, Guidant does not have any admissible evidence to show that this is true. But Baer admits that the noncompete agreement (assuming it is valid) bars him from selling to the Pittsburgh doctors at issue.

his employment. The scope of the noncompete agreement is eminently reasonable, and there is no reason to narrow it further by a strained reading of the definition of "GSC Accounts."

Having reviewed the evidence, the Court finds that Guidant is likely to succeed in proving that certain of the doctors with whom Baer had contact in 2008 — specifically, Drs. George Yesenosky, Christopher Schulze, Kataneh Maleki, Suman Jaswal, Fermin Garcia, and Glen Miske — are "GSC Accounts" within the meaning of the noncompete agreement. Throughout 2008, Baer spoke on the telephone on multiple occasions with Drs. Yesenosky, Jaswal, Maleki, and Schulze. Plf.'s Ex. 3; Sheehan Decl. ¶ 23. All of these calls were paid for by Guidant. Plf.'s Ex. 3; Sheehan Decl. ¶ 23. Baer also flew to Philadelphia on Guidant's behalf five times during 2008 and, while in Philadelphia on Guidant business, also entertained Drs. Maleki, Jaswal, and Miske at Guidant's expense. Plf.'s Exs. 1, 2; Sheehan Decl. ¶ 20. Baer's only explanation for these calls and dinners is that they were based on his personal friendship with these doctors, *see* Baer Decl. ¶¶ 10-11, but that does not explain why Baer asked Guidant to pay for them.

In addition to these contacts, Baer attended a Guidant event in Philadelphia to publicize the rollout of two new CRM products in November 2008. Winiecki Decl. ¶ 8. After attending the event, Baer hosted a dinner, at Guidant's expense, for Drs. Yesenosky, Jaswal, and Garcia. Winiecki Decl. ¶ 9. The fact that Guidant paid for Baer to attend an event that was intended to promote new Guidant products to doctors in Philadelphia — including doctors who were former customers of Baer's and with whom Baer had maintained a relationship — strongly suggests that Baer's presence was in support of the sale of these products. That, in turn, further underscores the likelihood that Baer's other Philadelphia contacts were also intended to support the sale of

Guidant products.  Furthermore, Baer admits that four of the Philadelphia doctors (Drs. Yesenosky, Schulze, Jaswal, and Maleki) were his customers when he was a sales representative in Philadelphia.  Baer Decl. ¶ 8.  Baer's preexisting sales relationships with these doctors also supports an inference that Baer's later contacts with them were for the purpose of supporting sales.

It is true, as Baer asserts, that he did not have managerial responsibility for sales in Philadelphia.  But Baer was eligible for a bonus based on sales goals for an area that included Philadelphia, which gave Baer an incentive to help Guidant make sales in Philadelphia.[8]  Sheehan Decl. ¶¶ 25-26.  Baer points out that all regional sales managers were eligible for such bonuses, but it does not follow, as Baer contends, that his individual efforts were therefore irrelevant.

Based on the evidence outlined above, the Court finds that Guidant is likely to succeed in establishing that Drs. Yesenosky, Schulze, Maleki, Jaswal, Garcia, and Miske are "GSC Accounts" within the meaning of the noncompete agreement.  There is also evidence that Baer has contacted three of these doctors (Drs. Yesenosky, Jaswal, and Schulze) since he began working for Biotronik.  Koenig Decl. ¶¶ 6-8, 11.  Baer does not really dispute that these contacts violated the noncompete agreement if those doctors are "GSC Accounts" within the meaning of the noncompete agreement.  Given the Court's conclusion that Guidant is likely to succeed in demonstrating that Drs. Yesenosky, Schulze, Maleki, Jaswal, Garcia, and Miske are indeed

---

[8]Baer denies receiving such a bonus, but does not dispute Guidant's assertion that he was eligible for one.

"GSC Accounts," there is a strong likelihood that Baer is violating or intends to violate the noncompete agreement with respect to these doctors.

With respect to other doctors: As explained more fully at the hearing, Guidant's evidence regarding other doctors is either inadmissible or too weak to support an inference that Baer was supporting the sale of Guidant products to them at the relevant times. For example, Guidant points to a 2008 educational seminar in Pittsburgh to which Baer invited several doctors from Philadelphia. Although it may be the case, as Guidant contends, that the Philadelphia doctors' presence at the conference was intended to support the sale of Guidant products to those doctors, an equally plausible inference is that Baer was relying on those doctors to help him sell Guidant products to doctors in Pittsburgh. Guidant has thus not established that it is likely to succeed in proving that Baer is violating or intends to violate the noncompete agreement with respect to the remaining doctors.

*C. Threat of Irreparable Harm*

The customer base for CRM devices consists of highly trained medical specialists, a very sophisticated and demanding clientele. Sheehan Decl. ¶¶ 5-6. To be successful, CRM salespeople must be both skilled at sales and have substantial technical and clinical knowledge. Sheehan Decl. ¶ 4. CRM salespeople are often in the operating room when CRM devices are implanted, and they provide technical assistance to the doctor both during the implantation procedure and during patients' followup visits. Sheehan Decl. ¶ 4. CRM salespeople are also expected to learn about doctors' individual practices to better communicate with the doctors and be more effective at making sales. Sheehan Decl. ¶ 7. Not surprisingly, Guidant values the relationships between its sales force and its customers very highly and devotes substantial time,

effort, and money to developing those relationships and training and supporting its salespeople. Sheehan Decl. ¶¶ 5-7.

Courts have consistently found that long-term customer relationships in the CRM industry are a legitimate business interest that may be protected by a noncompete clause. *Prow v. Medtronic, Inc.*, 770 F.2d 117, 120-21 (8th Cir. 1985); *Guidant Sales Corp.*, 2001 WL 1636502, at *7. Baer argues, though, that because doctors are ethically and legally obligated to make treatment decisions based on the best interests of their patients, Guidant cannot show that its customer relationships are an important factor in making sales.

The Court rejects this argument for several reasons. First, under Minnesota law, irreparable harm may be inferred from the breach of a valid noncompete agreement. *Guidant Sales Corp.*, 2001 WL 1636502, at *8. Second, Baer's argument overlooks the fact that a sales representative's ability to persuade a doctor that use of Guidant products *is* in the best interests of the doctor's patients depends on the sales representative learning a lot about the doctor's practice, and the doctor learning a lot about Guidant's products. This, in turn, depends on the sales representative and the doctor developing a trusting, long-term relationship. Baer himself spent hundreds of hours fostering such relationships with doctors while being paid by Guidant — and spent thousands of Guidant's dollars entertaining those doctors. Baer must understand as well as anyone that, in a competitive industry in which the clientele is particularly sophisticated and the products are technically complex, the trust and personal knowledge of the customer engendered by a long-term relationship is helpful to making sales. Finally, even if these considerations were not enough to establish irreparable harm, Guidant offers evidence that when a successful salesperson leaves, Guidant often experiences a loss of sales in the accounts served

by the former salesperson. Sheehan Decl. ¶ 6. The Court therefore finds that Guidant has established a likelihood of irreparable harm if its motion is not granted.

### D. Balance of Harms and the Public Interest

Guidant asserts, and Baer does not dispute, that Baer is entitled to guaranteed compensation of $600,000 during his first year at Biotronik.[9] Given that Baer's compensation is guaranteed regardless of the outcome of Guidant's motion, the balance of harms tilts strongly in Guidant's favor. In addition, the public interest favors the enforcement of a valid noncompete agreement.

### E. Conclusion

The Court finds that each of the *Dataphase* factors favors the issuance of an order enforcing the noncompete agreement and enjoining Baer from violating it. Pursuant to Fed. R. Civ. P. 65(c), the Court will order Guidant to post security in the amount of $100,000. Such amount is proportional to the amount by which Baer's compensation varied while at Guidant and represents the Court's best estimate, on this sparse record, of the possible damages Baer could suffer from a wrongful injunction.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for a temporary restraining order [Docket No. 2] is GRANTED IN PART.

---

[9]Guidant's evidence on this point is hearsay, *see* Sheehan Decl. ¶ 32, but the Court takes it as true because Baer has not disputed it and because it appears highly unlikely that Baer could have been lured away from Guidant without a substantial guaranteed salary.

2. Defendant is hereby ENJOINED from directly or indirectly selling, soliciting the sale of, supporting the sale of, supporting or supervising the sale or implantation or other use of, or otherwise having any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect of any cardiac rhythm management product with respect to any GSC Account.

3. For purposes of ¶ 2 of this order, "GSC Account" means those physicians, hospitals, clinics, and other persons and entities to whom or for whom, defendant or persons under defendant's supervision sold, solicited the sale of, supported or supervised the sale of, or supported or supervised the implantation or other use of any Guidant product during the period from December 20, 2007 through December 19, 2008. "GSC Account" includes not only the persons and entities themselves, but also those employees, agents, or other affiliated persons involved in the purchase, implantation, or use of any Guidant product. The GSC Accounts to whom the injunction in ¶ 2 of this order apply include, but are not limited to, the following individuals:

   a. Dr. George Yesenosky
   b. Dr. Christopher Schulze
   c. Dr. Kataneh Maleki
   d. Dr. Suman Jaswal
   e. Dr. Fermin Garcia
   f. Dr. Glen Miske

4. The injunction in ¶ 2 of this order will take effect on plaintiff's posting of security in the amount of $100,000.

5. The injunction in ¶ 2 of this order will remain in effect through and including December 18, 2009 unless vacated at an earlier date by order of the Court.

6. Plaintiff's motion is DENIED in all other respects.


Dated: February 26, 2009                                s/Patrick J. Schiltz
                                                        Patrick J. Schiltz
                                                        United States District Judge